# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs March 1, 2011

## STATE OF TENNESSEE v. ERNEST LEE JENNINGS

**Direct Appeal from the Circuit Court for Fayette County**
**No. 6337     J. Weber McCraw, Judge**

_____

**No. W2010-01484-CCA-R3-CD  - Filed August 3, 2011**

_____

A Fayette County jury convicted the Defendant, Ernest Lee Jennings, of sexual exploitation of a minor and three counts of rape of a child, and the trial court sentenced him to an effective sentence of eighty-five years in the Tennessee Department of Correction.  On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that the trial court erred when it imposed consecutive sentencing.  After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ALAN E. GLENN, and CAMILLE R. MCMULLEN, JJ., joined.

Gary F. Antrican and Shana Johnson (at trial and on appeal), Somerville, Tennessee, and Clifford K. McGown, Jr. (on appeal), Waverly, Tennessee, for the Appellant, Ernest Lee Jennings.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Mike Dunavant, District Attorney General; and Terry Dycus, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

This case arises from the Defendant's rape of three minor boys and his possession of child pornography.  Based on this conduct, a Fayette County grand jury indicted the Defendant for attempted rape of a child, sexual exploitation of a minor, and three counts of

rape of a child.[1]  The following evidence was presented at the Defendant's trial: R.M.[2] testified that, at the time of these crimes, he was nine years old.  R.M. explained that the Defendant was married to his aunt and that, at the time of these incidents, the couple had been living in the front room of the home R.M. lived in with his parents and brothers.  R.M. recalled one day in particular when he and his brothers were at home alone with the Defendant.  The Defendant told the other boys to go outside but told R.M. to stay in the house or "he would shoot [R.M.]."  R.M. testified that he was scared of the Defendant and remained in the house.  The Defendant handcuffed R.M. to the headboard and removed R.M.'s clothes.  Describing what the Defendant next did, R.M. said the Defendant "put his wee-wee on my butt and made me suck his wee-wee and he done that to me, too."  R.M. said that sperm, which was "white and gooey," came out of the Defendant's penis, and the Defendant wiped it away with a towel.  The Defendant told R.M. that if R.M. told his mom and dad, the Defendant would kill R.M.  R.M. testified these events occurred during the summer, while he was out of school, but he did not remember the specific month.

On cross-examination, R.M. agreed that the Defendant was a security guard and that the gun, handcuffs, and pepper spray in his bedroom were for the Defendant's job.  R.M. described the Defendant's bed as having bars along the headboard and explained the Defendant handcuffed R.M. to these bars.  R.M. testified that the Defendant showed him a gun during these events and told R.M. not to tell anyone.  R.M. said that the first time he spoke of this incident with the Defendant was after he heard his cousin mention that the Defendant had engaged in similar behavior toward him.  R.M. recalled that the Defendant overheard R.M. and his cousin talking about what the Defendant had done to them, and the Defendant said he was going to leave.  After the Defendant left, R.M. told his parents what had occurred.

C.M., R.M.'s younger brother, who was eight at the time of these crimes, identified the Defendant in court and, when asked how he knew the Defendant, replied, "'Cause he did nasty stuff to me."  C.M. said that, in the spare bedroom, the Defendant, "Put sperm in my mouth and put his wee-wee in my butt."  C.M. described the sperm as tasting like salt.  C.M. said that the Defendant undressed himself and then removed C.M.'s clothes.  C.M. said that this incident occurred during a school break, in the "morning time" while everyone else was at the store.  C.M. said that the Defendant told C.M. not to tell anyone what had happened

---

[1] Before this trial, the attempted rape of a child and solicitation of a minor counts were severed and ultimately dismissed by the State.

[2] It is the policy of this Court to refer to juvenile victims of sexual assault by their initials only.

but did not threaten him.

T.W., R.M. and C.M.'s cousin who was six at the time of trial, identified the Defendant and testified that the Defendant "sucked [his] wee-wee" when he was visiting his cousins. He recalled that, when he and the Defendant were in the Defendant's room, the Defendant told T.W. to take his clothes off, and T.W. did so. The Defendant then told T.W. to suck his penis. T.W. testified that the Defendant "put [his penis] in my butt" and licked T.W.'s butt. T.W. said that he was scared, so he tried to "get away" and told the Defendant to stop. The Defendant told T.W. not to tell anyone what had occurred. T.W. said that these events occurred in the summer while he was out of school. During the summer, he would spend the night with his cousins and these events occurred during one of those occasions.

N.M., R.M. and C.M.'s older brother who was thirteen at the time of trial, confirmed that the Defendant lived in his home temporarily. He recalled that, in June of the previous year, N.M.'s grandmother had a mild heart attack, and the three boys stayed at home with the Defendant while their parents and aunt, the Defendant's wife, went to the hospital. While N.M.'s parents were gone, the Defendant told N.M.'s brothers to go outside. The Defendant told N.M. to come to the Defendant's room to watch television but instead showed N.M. a video on the Defendant's laptop of a man and a woman having sex. The Defendant then asked N.M., "Would you like to do that with me?" To which N.M. replied, "No." N.M. testified that the Defendant "tried to make me and I kept on telling him no . . . ." The Defendant threatened N.M. that, if he told anyone about what had occurred, he would shoot N.M. After being in the Defendant's room for about an hour, N.M. got up to leave, but the Defendant began to chase him, so he "started running around the room and unlocked the door and ran."

Chad Lawson, a Somerville Police Department Investigator, testified that, on September 3, 2009, he was dispatched to a residence where a possible child rape occurred. En route, Officer Lawson was notified that the Defendant was "at the jail trying to get in." Officer Lawson said that he continued to the residence to assess the situation before responding to the jail. After securing services for the children and assigning officers various duties, Officer Lawson called the jail and instructed that the Defendant be "put [] in a room till [he] could get there."

Officer Lawson testified that the children were interviewed by forensic interviewers who specialize in talking with child victims. Officer Lawson watched the interviews from an observation room. Officer Lawson said that the children's in-court testimony was consistent with what they said in the forensic interviews.

After beginning the process of taking statements from witnesses, Officer Lawson went

to the jail to meet with the Defendant. Officer Lawson said that he thought it "unusual" that the Defendant was "trying to get in the jail." Officer Lawson met with the Defendant in a room at the jail where he read the Defendant his Miranda rights and then took a statement from the Defendant. Officer Lawson recalled that he asked the Defendant why he came to the jail. The Defendant responded that, because he was an armed security guard, he preferred to turn himself in rather than be arrested at his place of work. Officer Lawson then asked the Defendant a series of questions, during which Officer Lawson took notes. The Defendant and Officer Lawson then initialed those notes, indicating they agreed with the content. Officer Lawson said that the statement did not represent the "entire conversation" but was a summary of the Defendant's responses to questions.

Reviewing his notes, Officer Lawson recalled that, when he asked the Defendant, "How did you get in jail," the Defendant responded, "When they started saying I had sexual contact with them, I left the house and turned myself in to the jail." The Defendant, however, denied having any sexual contact with the children. The Defendant told Officer Lawson that the children had "come on" to the Defendant.

Officer Lawson testified that, after he learned that the Defendant's wife had pawned the Defendant's laptop, he retrieved the laptop from the pawn shop. Pawn shop records indicated that the Defendant's wife pawned the computer on August 11, 2009. The pawn shop records further indicated that, on the same date, the Defendant pawned a Taurus .9 millimeter gun. After obtaining the laptop, Officer Lawson had the laptop analyzed.

Officer Lawson testified that he also conducted a search of the residence and recovered pornographic CDs and photographs from the night stand next to the bed in the Defendant's bedroom. Approximately 105 of the photographs and the images recovered from the CDs were child pornography. In addition to those images, Officer Lawson recovered cartoons depicting sexual activity with children. Officer Lawson said that an Emachine, computer tower, and zip drives were also recovered from the residence and sent for analysis. Officer Lawson recalled that the Defendant's bedroom door was equipped with a lock and that he found a security guard uniform patch, condoms, and a dildo in the Defendant's room. The Defendant's wife denied owning the dildo. Officer Lawson also found firearms and a law enforcement "duty belt" with a baton, handcuffs, and a flashlight in the Defendant's vehicle.

On cross-examination, Officer Lawson agreed the Defendant disclosed in his interview that his wife had pawned his laptop and that pawn shop records confirmed the Defendant's laptop was pawned on August 11, and the police recovered it from the pawn shop on September 4. Officer Lawson testified that he did not search the home in which these crimes were alleged to have occurred until September 10. Even though the Defendant

4

left the residence on September 3, the family remained in the residence from the time the Defendant turned himself in until the police searched the residence. Reviewing a photograph he took of the Defendant's bed, he agreed that there was not a headboard or any bars or boards at the head of the bed. Officer Lawson testified that the Defendant's wife and the victims' parents claimed no ownership of the pornographic pictures and CDs recovered from the Defendant's bedroom. Officer Lawson said that the CDs contained files with the Defendant's name on them. Officer Lawson agreed that, although it was possible to have the dildo tested for bodily fluids, this testing was not done. Likewise, police never attempted to recover fingerprints from the Defendant's handcuffs or any of the other items recovered. The Defendant told Officer Lawson that he and his wife moved into the house where these crimes occurred in November 2008 and remained there until he turned himself in at the jail on these charges in September 2009.

Steve Bierbrodt, a Shelby County Sheriff's Office detective, testified as an expert in the field of computer forensics. Detective Bierbrodt said that Officer Lawson requested Detective Bierbrodt run a computer analysis on the Defendant's computers and review multiple CDs. The computer analysis of the laptop, zip drives, and the Emachine revealed nothing of evidentiary value to this case. The CDs, however, contained more than 100 individual, separate images of child pornography both in video format and still-frame pictures. Detective Bierbrodt also found files with pornographic images on the Defendant's Gateway computer tower. One such picture was of a young nude boy with bandages on his body. Detective Bierbrodt said that he recovered this photograph from the computer's C-drive under "Pictures" with information indicating the Defendant's name and the file name "boys will be bois." The detective also found a picture of the Defendant on the C-drive within the "Pictures" file.

On cross-examination, Detective Bierbrodt agreed that he can tell when an item was created or modified but not who put the items on the CD.

Amber Jennings, the Defendant's wife, testified that she had been married to the Defendant for a year and three months. She met the Defendant through her mother, who worked for the Defendant. Jennings said that the Defendant first met her nephews when her sister brought them to see their grandmother at work. Jennings testified that she and the Defendant moved in with her sister on November 15, 2008, and remained there until September 2009 when the Defendant turned himself in on these charges. Jennings acknowledged that she was initially hostile to the officers investigating this case because she "didn't want to believe it."

Jennings described her marital relationship with the Defendant as "a little strange." In retrospect, she believed that the Defendant used her to access her nephews. When asked

5

if she and the Defendant had "a sex life" during their marriage, she replied, "Not really." She explained that the Defendant "always" asked if her nephews could sleep in their room with them. When her nephews did so, the Defendant would ask Jennings to either sleep on the floor or "somewhere else." Jennings also said that when she had found her husband watching pornographic movies, she would ask the Defendant "why" he viewed these movies, but she never received an answer from him. She also noticed the Defendant looking in on the boys while they were bathing.

Jennings testified that she had access to the laptop but that she could not access certain files. Jennings said that, at the Defendant's request, she sold his laptop for $100 to a pawnshop on August 11, 2009. Jennings denied any knowledge of child pornography on the computers or in the night stand by their bed.

Jennings recalled that, on July 15, 2009, her mother had a heart attack and was taken to the hospital. Jennings, her sister, and her brother-in-law went to the hospital, leaving the Defendant to care for the three boys, N.M., C.M., and R.M.

Jennings recalled that the night the Defendant turned himself in, he had walked past N.M's bedroom and overheard N.M. and T.W. "saying something" that "set [him] off." Jennings said that the Defendant told her he was "just going to turn hi[m]self in." She said that she "didn't know what all was going on" because she did not hear what the boys had said.

On cross-examination, Jennings testified that she could not create files on the Defendant's laptop. She said she and the Defendant were expecting a baby at one point in their marriage but that she miscarried. She said that she moved out of her sister's residence in September 2009 and had not lived there since that time. Jennings agreed that she has visited with the Defendant during his incarceration for these charges.

Based upon this evidence, the jury convicted the Defendant of sexual exploitation of a minor and three counts of rape of a child.

## B. Sentencing Hearing

At the sentencing hearing on this matter, the following evidence was introduced: B.M., the mother of R.M., C.M., and N.M., testified that she allowed her sister and her sister's husband, the Defendant, to stay in her home. During this time, the Defendant cared for B.M.'s children as a "babysitter" at times. B.M. said she "trusted [the Defendant] with the most precious thing that I have in this world." B.M. made the following statement to the court:

Judge, this man took away my children's innocence and there's no – nothing can bring that back. Nothing in the world can bring my kids' innocence back. They grew up way too soon and he had a choice. I know he was - - you know, he was messed with when he was a child but he had a choice to get some help and make his life better. He made the wrong choice and in my opinion he doesn't deserve to ever see the light of day, ever. And I am so proud of my family because they made it to where he can't ever hurt anybody else's children ever again.

T.W.'s mother read a letter, which was included as an exhibit into the record at the sentencing hearing. The State submitted the pre-sentence report and letters from two of the victims and the victims' family members. The trial court sentenced the Defendant to serve twenty-five years for each count of rape of a child and ten years for the sexual exploitation of a minor conviction. The trial court also ordered the Defendant's sentences be served consecutively for an effective sentence of eighty-five years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant asserts that the evidence is insufficient to sustain his convictions and that the trial court erred when it ordered consecutive sentencing.

### A. Sufficiency of the Evidence

The Defendant asserts that, because in his statement to Detective Lawson he denied having any sexual contact with the victims, the evidence is insufficient to sustain his convictions. The State counters that the victims' testimony regarding the Defendant's conduct is sufficient evidence from which a reasonable juror could conclude that the Defendant committed three counts of rape of a child and one count of sexual exploitation of a minor.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and

connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).

In this case, the Defendant was convicted of three counts of rape of a child and one count of sexual exploitation of a minor. A conviction for rape of a child requires proof beyond a reasonable doubt that the defendant unlawfully sexually penetrated the victim, and the victim is "more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2009). A conviction for sexual exploitation of a minor requires the State to show that the Defendant "knowingly possess[ed] material that include[d] a minor engaged in . . . [s]exual activity; or . . . [s]imulated sexual activity that is patently offensive." T.C.A. § 39-17-1003(a) (2009).

The evidence, considered in the light most favorable to the State, proves that while the Defendant was at home alone with his nephews, he told the other children to go outside and told R.M., a nine-year old child, to remain inside. The Defendant removed both his clothing and R.M.'s clothing, placed his penis on R.M.'s buttocks, and forced R.M. to perform fellatio. The Defendant also performed fellatio on the victim. The Defendant ejaculated at some point during this incident. This evidence is sufficient to support one count of rape of a child.

The evidence further shows that the Defendant engaged in sexual conduct with eight-year-old C.M. C.M.'s testimony described the Defendant as doing "nasty stuff." The Defendant "put sperm" in C.M.'s mouth and "put his wee-wee" in C.M.'s "butt." This is sufficient to support a second count of rape of a child.

The evidence also showed that, while T.W., who was six year -old at the time of trial, was visiting his cousins, the Defendant performed fellatio on T.W. and made T.W. perform fellatio on him. T.W. testified that the Defendant put his penis "in [T.W.'s] butt" and licked T.W.'s buttocks. This is sufficient to support the Defendant's third conviction of rape of a child.

As to the conviction for sexual exploitation of a minor, the evidence shows that the Defendant showed N.M. pornography on his laptop. Police recovered pornography and child pornography from the Defendant's laptop which he had instructed his wife to sell at a pawn shop in August 2009. The files that contained child pornography on the Defendant's laptop were labeled with the Defendant's name. The Defendant's wife had access to this computer but was unable to create new files on the computer. Child pornography was recovered from the Defendant's night stand in his bedroom. The Defendant's wife, who shared this room, denied any knowledge or ownership of the child pornography but testified that she had witnessed her husband watching pornographic movies.

The Defendant argues that the evidence was insufficient to support his convictions because, in the Defendant's statement to Detective Lawson, he denied all sexual contact with the victims. Officer Lawson testified that, during the police interview, the Defendant denied any sexual contact with the victims. The victims testified, however, that the Defendant on multiple occasions made sexual advances toward them and forced them to engage in sexual contact. As we earlier stated, all questions of credibility raised are determined by the jury, which is the "primary instrumentality of justice" in matters of credibility of witness testimony. *Bolin*, 405 S.W.2d at 771; *see also*, *Bland*, 958 S.W.2d at 659; *Liakas*, 286

9

S.W.2d at 859. The jury heard the evidence and clearly did not credit the Defendant's denial during his police interview. It is not within this Court's discretion to re-weigh and determine the credibility of witnesses. *See Matthews*, 805 S.W.2d at 779.

Accordingly, we conclude that the evidence is sufficient to support the convictions beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

## B. Sentencing

The trial court sentenced the Defendant to twenty-five years for each of his three rape of a child convictions and ten years for his sexual exploitation of a minor conviction. The trial court then ordered that all of the sentences run consecutively to each other for an effective sentence of eighty-five years. The Defendant appeals this decision, arguing that the trial court erred when it ordered consecutive sentencing in this case. The State responds that the record supports consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(5) (2009).

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2009). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts (2009). This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, Tennessee Code Annotated section 40-35-103 (2009), the appellate court may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the

10

parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 4-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2009); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). We must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2006).

If an offender meets one or more statutory criteria in Tennessee Code Annotated section 40-35-115, whether or not he should be sentenced consecutively or concurrently is within the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the seven factors exists. The factor relevant to this case is factor (5), that:

> [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims . . . .

T.C.A. § 40-35-115(b)(5).

In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

When the trial court ordered that the Defendant's sentences run consecutively, it found that the Defendant's case "squarely falls within [the criterion 5] consideration for consecutive sentencing."

The Defendant was convicted of three counts of rape of a child. When the Defendant was left alone with his nephews, he engaged in sexual conduct with these children. The

Defendant also engaged in this conduct with a child who was visiting his nephews in their home. This conduct occurred during the summer until the Defendant overheard the boys discussing amongst themselves the Defendant's conduct. At this point, the Defendant turned himself in at the jail. The Defendant's conduct included performing oral sex on the boys, having the boys perform oral sex on him, and sexually penetrating the boys. The victim impact statements included with the pre-sentence report indicate residual emotional and mental damage to the victims.

Based upon the foregoing, we conclude that the record adequately supports the trial court's application of criterion (5) and that, as such, the trial court properly ordered consecutive sentencing. We, therefore, affirm the judgments of the trial court. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

12